## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Sherif Albert DDS, P.C., d/b/a Esplanade Dental Care, et al., | |
| Plaintiffs, | No. 21 CV 04672 |
| v. | Honorable Nancy L. Maldonado |
| The Cincinnati Insurance Company, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

This case involves commercial insurance coverage for businesses affected by the COVID-19 pandemic. Plaintiffs are owners and operators of three dental practices in Illinois, each of which was forced to suspend its operations due to pandemic-related government closure orders. Plaintiffs allege that Defendant, the Cincinnati Insurance Company ("Cincinnati"), wrongfully denied their insurance claims for lost business income they incurred as a result of the closure orders. Cincinnati has moved to dismiss, primarily arguing that Plaintiffs have failed to allege a "direct physical loss" to their properties as required by their insurance policies. (Dkt. 17.)[1] For the reasons stated in this opinion, in light of controlling Seventh Circuit precedent, Cincinnati's motion to dismiss is granted and the complaint is dismissed without prejudice. Plaintiffs shall have 28 days from the date of this order to file a motion for leave to file an amended complaint, if they believe they can remedy the deficiencies in their complaint outlined herein.

## Background

Plaintiffs are three Illinois-based entities that own and operate dental practices in Downers Grove, New Lenox, and Hinsdale, Illinois. (Dkt. 1 at ¶ 1.)[2] Defendant Cincinnati is an Ohio-based corporation engaged in the business of selling insurance policies to commercial entities, including those providing professional dental services, such as Plaintiffs.[3] Cincinnati issued two policies to

---

[1] Referenced page numbers are taken from the CM/ECF header.

[2] Specifically, Plaintiff Sherif Albert DDS, P.C, d/b/a Esplanade Dental Care ("Esplanade Dental Care") is an Illinois professional corporation with its principal place of business in Downers Grove, Illinois; Plaintiff Albert Dental Professionals, P.C., d/b/a Atrium Family Dental ("Atrium Family Dental") is an Illinois professional corporation with its principal place of business in New Lenox, Illinois; and Albert and Albert Dental Health Associates, Ltd., d/b/a Brush Pediatric Dentistry ("Brush Pediatric Dentistry") is an Illinois professional corporation with its principal place of business in Hinsdale, Illinois. *Id.* at ¶19.

[3] The complaint originally named several other defendants, each of which has been voluntarily dismissed by Plaintiffs. (Dkts. 15, 16.)

Plaintiffs, one covering Plaintiff Brush Pediatric Dentistry from May 9, 2017, to May 9, 2020 (Policy No. ECP 024 93 62, hereafter the "2017 Brush Pediatric Policy"), which was subsequently renewed for a period through May 9, 2023 (hereafter the "2020 Brush Pediatric Renewal"); and one policy covering both Plaintiffs Esplanade Dental Care and Atrium Family Dental for the period February 1, 2020, to February 1, 2023 (No. ECP 022 69 42, hereafter the "2020 Esplanade and Atrium Policy").[4]

The insurance policies provide Plaintiffs' businesses with Building and Personal Property Coverage, as well as "Business Income," "Extra Expense," and "Civil Authority" coverage. (Dkt. 1 at ¶¶ 29, 41.) The language in the 2017 Brush Pediatric Policy varies slightly from the language in the 2020 Brush Pediatric Renewal and 2020 Esplanade and Atrium Policy, so the Court will set out the relevant policy provisions separately.

### A. 2017 Brush Pediatric Policy language

The Building and Personal Property Coverage in the 2017 Brush Pediatric Policy states that Cincinnati "will pay for direct physical 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." (Dkt. 18-1 at 30.) "Covered Causes of Loss," according to the policy, means "risks of direct physical loss unless the 'loss' is: (1) Excluded in Section A. Coverage, 3. Covered Causes of Loss, b. Exclusions; or (2) Limited in Section A. Coverage, 3. Covered Causes of Loss, c. Limitations." *Id.* at 32. "Loss" in this policy means "accidental loss or damage." *Id.* at 61.

As noted above, the policy also provides for Business Income and Extra Expense coverage:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.

*Id.* at 43. In terms of Extra Expense coverage, the policy states that Cincinnati will pay the "'Extra Expense' you incur during the 'period of restoration': (a) To avoid or minimize the 'suspension' of business and to continue 'operations' . . . or (b) To minimize the 'suspension' of business if you

---

[4] Plaintiffs attach the 2017 Brush Pediatric Policy and the 2020 Esplanade and Atrium Policy to their complaint, (Dkts. 1-1, 1-2,) which makes the policies part of the pleading. *See* Fed. R. Civ. P. 10(c). Plaintiffs' complaint does not attach the 2020 Brush Pediatric Renewal Policy, but cites to it. (*See* Dkt. 1 at ¶¶ 73, 77-79.) Cincinnati has attached copies of all three policies, including the renewal policy, to its motion to dismiss, and the Court may consider the renewal policy without converting Cincinnati's motion into one for summary judgment. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.") (citations omitted). The Court will cite to the versions of the policies attached to Cincinnati's motion. (*See* Dkts. 18-1, 18-2, 18-3.) The versions of the 2017 Brush Pediatric Policy and the 2020 Esplanade and Atrium Policy attached to the motion to dismiss are identical to the versions of those policies attached to the complaint, except that Cincinnati has applied bates numbers. (Dkt. 18 at 4 n.3.)

cannot continue 'operations.'" *Id.* at 44. "Period of restoration" is defined as "the period of time that . . . [b]egins at the time of direct physical 'loss.'" *Id.* at 61.

Finally, the policy also provides for Civil Authority coverage:

> We will pay for the actual loss of "Business Income" you sustain and "Extra Expense" you incur caused by action of civil authority that prohibits access to the "premises" due to direct physical "loss" to property, other than at the "premises", caused by or resulting from any Covered Cause of Loss.

*Id.* at 44.

### B. 2020 Brush Pediatric Renewal and 2020 Esplanade and Atrium Policy language

The Building and Personal Property Coverage in the 2020 Brush Pediatric Renewal and 2020 Esplanade and Atrium Policy states that Cincinnati "will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." (Dkts. 18-2 at 27; 18-3 at 39.) "Covered Causes of Loss," according to the policy, means "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." (Dkts. 18-2 at 29; 18-3 at 41.) "Loss" in these policies is defined as "accidental physical loss or accidental physical damage." (Dkts. 18-2 at 62; 18-3 at 74.)

Again the policies both provide for Business Income and Extra Expense coverage:

> We will pay for the actual loss of "Business Income" and "Rental Value" you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct "loss" to property at a "premises" caused by or resulting from any Covered Cause of Loss.

(Dkts. 18-2 at 42; 18-3 at 54.) In terms of Extra Expense coverage, the policies state that Cincinnati will pay the "Extra Expense you sustain during the 'period of restoration.' Extra Expense means necessary expenses you sustain . . . during the 'period of restoration' that you would not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss." (Dkts. 18-2 at 43; 18-3 at 55.) "Period of Restoration" is defined in these policies as "the period of time that . . . [b]egins at the time of direct 'loss.'" (Dkts. 18-2 at 62; 18-3 at 74.)

These policies also provide for Civil Authority coverage in similar terms:

> [W]e will pay for the actual loss of "Business Income" and necessary Extra Expense you sustain caused by action of civil authority that prohibits access to the "premises", provided that . . . (a) Access to the area immediately surrounding the damaged

property is prohibited by civil authority as a result of the damage; and (b) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage . . . .

(Dkts. 18-2 at 43; 18-3 at 55.)

### C.  Government shut-down orders and Plaintiffs' claims

On March 15, 2020, in response to the escalating COVID-19 pandemic, Illinois Governor J.B. Pritzker issued an order closing all restaurants and bars to the public. (Dkt. 1 at ¶ 3.) A few days later on March 20, 2020, Governor Pritzker ordered all "non-essential businesses" to close. *Id.* Then, on April 14, 2020, the Governor, in conjunction with the Director of the Illinois Department of Public Health, issued additional guidance for preventing the spread of COVID-19 which mandated the closure of dental offices for routine dental care and restricted all dental services to emergency and urgent care. *Id.* ¶ 7.

As a result of these closure orders, Plaintiffs allege they "were forced to halt ordinary operations, resulting in substantial lost revenues." *Id.* at ¶ 9. According to Plaintiffs, "[t]he continuous presence of the coronavirus amongst the public, and on or around Plaintiffs' premises, rendered the premises unsafe and unfit for their intended use and therefore, caused both physical loss and physical damage under the Policy." *Id.* at ¶ 46. Plaintiffs allege that the closure orders were issued "in direct response to these dangerous risks and dangerous physical conditions, and prohibited the public, other than for an emergency, from accessing Plaintiffs' dental offices, thereby causing a deprivation of the use of their business premises." *Id.* at ¶ 47. Plaintiffs further allege that they were prohibited "from providing virtually all of their ordinary and customary dental services, and prohibited the public from accessing Plaintiffs' offices, thereby causing the necessary suspension of their operations." *Id.* at ¶ 49.

Following the implementation of the closure orders, Plaintiffs submitted insurance claims to Cincinnati requesting coverage for the business interruptions. *Id.* at ¶ 51. On around May 28, 2020, Cincinnati denied their claims. *Id.* at ¶ 52. Plaintiffs now seek (1) a declaratory judgment regarding the scope of the policies and Cincinnati's obligation to pay, (2) damages for breach of contract, and (3) a penalty for bad-faith denial of insurance under 215 ILCS 5/155. *Id.* at ¶¶ 53-69, 102-118.

### Legal Standards

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016).  To survive a Rule 12(b)(6)

motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) ("[A] plaintiff must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.") (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When a court must interpret an insurance policy as part of resolving a motion to dismiss, the standard rules of contract interpretation apply: the "primary objective is to ascertain and give effect to the intention of the parties, as expressed in the policy language." *Westfield Ins. Co. v. Vandenberg*, 796 F.3d 773, 777-78 (7th Cir. 2015) (internal quotation marks and citations omitted). The parties agree that the policies are governed by Illinois law, and in Illinois, insurance policy construction is a question of law properly determined by the Court. *Roman Cath. Diocese of Springfield in Ill. v. Md. Cas. Co.*, 139 F.3d 561, 565 (7th Cir. 1998); *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E. 2d 338, 342 (Ill. 2006). "[I]f the terms of the policy are susceptible to more than one meaning, they are considered ambiguous and will be construed strictly against the insurer who drafted the policy." *Pekin Ins. Co. v. Wilson*, 930 N.E.2d 1011, 1017 (Ill. 2010) (internal quotation marks and citation omitted). However, a policy provision is not ambiguous solely because the parties disagree about its interpretation. *Founders Ins. Co. v. Munoz*, 930 N.E. 2d 999, 1004 (Ill. 2010).

## Discussion

Cincinnati's primary contention in support of dismissal is that Plaintiffs have failed to allege any "direct physical loss or damage" to their properties, which it maintains is a prerequisite for coverage under all three insurance policies at issue. (Dkt. 18 at 6.) Cincinnati argues that "direct physical loss or damage" requires a "demonstrable, physical alteration of the property," and that Plaintiffs' allegations about the "continuous presence" of the coronaviruses amongst the public and around Plaintiffs' premises do not satisfy this requirement. *Id.* at 7-8.

Plaintiffs, on the other hand, argue that physical damage to their property is not required, because the term "loss" is defined in the insurance policies as "accidental loss or damage," or "accidental physical loss or accidental physical damage," and the use of the disjunctive "or" between loss and damage demonstrates that physical loss of a property is a distinct concept from physical damage to the property. (Dkt. 22 at 6-7.) Thus, Plaintiffs maintain that physical damage or "alteration" of their property is not required, and they argue that the terms "direct loss" and "direct physical loss" encompass their alleged loss of use of their property due to the presence of the coronavirus and the government shut-down orders. *Id.* at 8.

Unfortunately for Plaintiffs, their arguments have been foreclosed by the Seventh Circuit's decision in *Sandy Point Dental, P.C. v. Cincinnati Insurance Co.*, 20 F.4th 327 (7th Cir. 2021).

*Sandy Point* involved the same types of plaintiffs (dental practices), the same defendant (Cincinnati), the same applicable policy language requiring "direct physical loss or damage" for coverage under the Business Income, Extra Expense, and Civil Authority provisions, and the same basic claim that the plaintiffs suffered business-income losses due to the government's shut-down orders in relation to the COVID-19 pandemic. *See Sandy Point Dental, P.C.*, 20 F.4th at 330-31. In *Sandy Point*, which was issued after Plaintiffs filed their response brief,[5] the Seventh Circuit rejected the plaintiffs' theory that a partial "loss of use, unaccompanied by any physical alteration to property, may constitute 'direct physical loss'" for the purpose of commercial property insurance like the policies here. *Id.* at 329-30, 334. The court also considered the same textual argument that Plaintiffs make in this case about the policies' use of the disjunctive "or" in the terms "loss or damage" within the definition of loss, and expressly rejected the suggestion that the disjunctive phrase means that loss need not have a physical aspect. *Id.* at 332 (explaining that because "[t]he phrase is 'direct physical loss or damage,'" "[w]hatever 'loss' means, it must be physical in nature"). The court reviewed the policy language as a whole, including the same provisions at issue here such as the "period of restoration" language that is part of the Extra Expense coverage, and concluded that "[t]he Policy is replete with textual clues that reinforce the conclusion that 'direct physical loss' requires a physical alteration to property." *Id.* at 333.

Turning to the question of whether COVID-19 and the government closure orders constituted a "direct physical loss," the Seventh Circuit rejected the suggestion that the mere presence of the virus, or the partial government closure orders, physically altered any of the plaintiffs' properties within the meaning of their policies. *Id.* at 335. The court contrasted the presence of the COVID-19 virus with cases involving insurance coverage for termite infestations, asbestos, and gas infiltration. *Id.* at 333-35 (citations omitted). The court noted that in the case of termites and asbestos there is unquestionably a "physical alteration" to the property beyond merely a loss of use. *Id.* at 333. The court recognized that cases involving gas infiltration were "a little closer to the mark," because gas infiltration might cause "loss of use without any accompanying physical alteration." *Id.* at 334. However, the court explained that the gas infiltration cases involved "more than a diminished ability to use the property"; rather, the gas was "so severe that it led to complete dispossession—something easily characterized as a 'direct physical loss.'" *Id.* ("[T]he courts [in these cases] concluded that the contamination made the premises 'uninhabitable,' and 'unfit for normal human occupancy.' In other words, the gas infiltration made physical entry impossible, thus barring all uses by all persons."). The court found that COVID-19 was distinguishable from these circumstances, because although the plaintiffs may have lost their "preferred" or "intended" use of their property, there was no physical alteration caused by COVID-19, nor had the virus caused a "complete physical dispossession" of their property. *Id.* at 335 ("Sandy Point at all times remained able to perform some dental work, and nothing precluded it from using the property for some other non-dental purpose consistent with the closure orders."). The court thus concluded that the plaintiffs had failed to adequately allege a physical alteration or its equivalent, which meant they had failed to allege a "direct physical loss" under the applicable

---

[5] Cincinnati raised *Sandy Point* in their reply brief, and the Court granted Cincinnati leave on two further occasions to supplement its briefing with additional case authority decided after their reply brief was filed. (Dkts. 26, 27, 29, 31.) Plaintiff filed responses to Cincinnati's supplemental authority, (Dkts. 28, 32,) but notably did not seek leave to file a sur-reply to address the *Sandy Point* decision raised in Cincinnati's reply.

policy. *Id.*[6]

*Sandy Point*'s holding has been repeatedly affirmed in subsequent decisions by the Seventh Circuit. *See, e.g.*, *ABC Diamonds Inc. v. Hartford Cas. Ins. Co*., No. 22-1026, 2022 WL 1830692, at *1 (7th Cir. June 3, 2022) ("[T]his court has repeatedly held that 'direct physical loss' means tangible, physical alteration to property, not merely loss of use."); *see also E. Coast Ent. of Durham, LLC v. Houston Cas. Co*., 31 F.4th 547, 551 (7th Cir. 2022) (applying holding of *Sandy Point* to affirm dismissal where plaintiff failed to allege a physical alteration of its property); *Paradigm Care & Enrichment Ctr., LLC v. W. Bend Mut. Ins. Co*., 33 F.4th 417, 422 (7th Cir. 2022) (same). And following the Seventh Circuit's ruling in *Sandy Point*, judges in this District have dismissed similar COVID-19 insurance actions involving identical policy language requiring "direct physical loss," including in several cases involving Cincinnati and at least one involving similar dental practice plaintiffs. *See, e.g.*, *Naperville Dental Specialists & Gen. Oral Health Care, P.C. v. Cincinnati Ins. Co*., No. 21 C 4671, 2022 WL 3684637, at *3 (N.D. Ill. Aug. 25, 2022) (dismissing case brought by four Illinois-based dental practices against Cincinnati based on the Seventh Circuit's holding in *Sandy Point*); *Valley Lo Club Ass'n v. Cincinnati Ins. Co*., No. 20-CV-04790, 2022 WL 2712534, at *4 (N.D. Ill. July 5, 2022) ("The Policy in this case, like the insurance policies in Sandy Point requires a physical alteration to the property. Valley Lo fails to allege any physical alteration of the property, so there is no coverage under the Policy."); *1501 Busch Parkway LLC v. Cincinnati Ins. Co*., No. 21-CV-02183, 2022 WL 202310, at *2 (N.D. Ill. Jan. 20, 2022) ("[C]lear authority in the Seventh Circuit bars Plaintiffs' claim.").

*Sandy Point* and its progeny thus require that the Court dismiss Plaintiffs' complaint. As in Sandy Point, all three insurance policies at issue here require "direct physical loss" in order to trigger coverage, including specifically the Business Income, Extra Expense, and Civil Authority coverage. "Direct physical loss," according to the Seventh Circuit, means a physical alteration to the property or complete physical dispossession. *See Sandy Point Dental, P.C.*, 20 F.4th at 329-30, 334. But Plaintiffs here have failed to allege any physical change or alteration to their property, or that they were completely dispossessed of their property due to COVID-19 and the government closure orders. Instead, Plaintiffs have alleged that the continuous presence of the coronavirus amongst the public and around their premises, along with the government closure orders, deprived plaintiffs of the intended use of their businesses. (*See* Dkt. 1 at ¶¶ 46-47.) But *Sandy Point* held that such allegations are insufficient to establish a "direct physical loss." *Sandy Point Dental, P.C.*, 20 F.4th at 335. Therefore, as Plaintiffs have failed to allege any "direct physical loss or damage" to their properties, there is no coverage under the applicable policies. Plaintiffs' claims for declaratory judgment and breach of contract must therefore be dismissed. *See, e.g.*, *Naperville Dental Specialists*, 2022 WL 3684637, at *3.

---

[6] The plaintiffs in *Sandy Point* also argued that they should be allowed to amend their complaint to add new allegations that "COVID-19 physically attaches itself to the physical premises, and thereby deprive[s] plaintiff of the use of said premises." *Id.* But the court found that the proposed amendment did not cure the deficiencies in the complaint, because "[e]ven if the virus was present *and* physically attached itself to Sandy Point's premises, Sandy Point does not allege that the virus *altered* the physical structures to which it attached, and there is no reason to think that it could have done so." *Id.* (noting that "deadly or not, [the virus] may be wiped off surfaces using ordinary cleaning materials, and it disintegrates on its own in a matter of days.").

Plaintiffs advance several other arguments against dismissal, but each does not save Plaintiffs' claims. For example, Plaintiffs attempt to argue that the term "physical" is not always used to define what constitutes a "loss" in all the policies at issue. (*See* Dkt. 22 at 5-6.) Plaintiffs point out that "loss" is defined in the 2017 Pediatric Policy as "accidental loss or damage" without the use of the word "physical" as it appears in the 2020 Brush Pediatric Renewal and 2020 Esplanade and Atrium Policy, and that in those later policies "Covered Causes of Loss" requires simply "direct loss" without the use of the word "physical." *Id.* at 6.[7] But Plaintiffs' argument misstates the plain language of the policies as it appears in context. While it is true that "loss" in the 2017 Pediatric Policy is defined without the use of the word "physical," the policy clearly states that Cincinnati will pay for "direct *physical* 'loss' to Covered Property," and the modifier term "physical" appears in each of the Business Income, Extra Expense, and Civil Authority coverage provisions. (*See* Dkt. 18-1 at 30, 43-44, 61.) And while the 2020 Brush Pediatric Renewal and 2020 Esplanade and Atrium Policy use the term "direct loss" instead of "direct physical loss," loss is defined in both of these policies as "accidental *physical* loss or accidental *physical* damage." (Dkts. 18-2 at 62; 18-3 at 74 (emphasis added).) Thus, any time the term "direct loss" appears in the policies, it again includes the modifier term "physical." Plaintiffs' attempts to distinguish the policy language are thus unavailing, and they cannot escape the holding from *Sandy Point* that the loss to their property must be physical in nature, i.e., that it must involve a physical alteration or change to their property or something akin to complete physical dispossession.

Plaintiffs additionally cite to two district court cases from this District in an attempt to support their interpretation of the policy. (Dkt. 22 at 11-17 (citing *Derek Scott Williams PLLC v. Cincinnati Ins. Co.*, 522 F. Supp. 3d 457 (N.D. Ill. 2021); *In re Soc'y Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 521 F. Supp. 3d 729 (N.D. Ill. 2021)).) But these cases are nonbinding and were decided before *Sandy Point.* While the Seventh Circuit did not directly address those decisions, they were discussed in the briefs submitted to the court in *Sandy Point*. *See Naperville Dental Specialists*, 2022 WL 3684637, at *3. The cases thus provide no basis for the Court to depart from the controlling authority in *Sandy Point*.[8]

Plaintiffs also suggest that the Civil Authority provisions of the policy independently provide coverage based on the government closure orders barring access to their property for normal business operations. (Dkt. 22 at 15.) But this argument has been rejected in other cases in this District involving the same or similar policy provisions. *See, e.g.*, *1501 Busch Parkway LLC*, 2022 WL 202310, at *3 ("[T]he Civil Authority provision also does not provide coverage."); *see also Firenze Ventures LLC v. Twin City Fire Ins. Co.*, 2021 WL 5865710, at *7 (N.D. Ill. Dec. 10, 2021) (holding that a similar Civil Authority provision provided no coverage). And while the Seventh Circuit did not directly discuss the Civil Authority provisions in that case, the court affirmed the District Court's dismissal of claims for Civil Authority coverage under the same policy language and government orders at issue here. *See Sandy Point Dental, P.C.*, 20 F.4th at

---

[7] Plaintiffs repeat this argument in their filings submitted in response to Cincinnati's supplemental authority, arguing that the cases cited by Cincinnati are distinguishable because they require "physical loss," which they maintain is not always required by the policies here. (*See* Dkts. 28, 32.)

[8] The same is true for the other state and federal authority from outside the Seventh Circuit cited by Plaintiffs in their briefing.

329-31; *see also Naperville Dental Specialists*, 2022 WL 3684637, at *3 (dismissing claim for Civil Authority coverage in nearly identical case).

In sum, the Court concludes that Plaintiffs have failed to allege "direct physical loss" as is required by the policies at issue, which necessitates dismissal of their declaratory judgment claim. As Plaintiffs have not established a valid claim for coverage under any of the policies, their claims for breach of contract and bad-faith denial of insurance must also fail. *See Naperville Dental Specialists*, 2022 WL 3684637, at *3 (citing *Rosebud Rest., Inc. v. Regent Ins. Co.*, No. 20 C 5526, 2022 WL 2669522, at *6 (N.D. Ill. July 11, 2022)).

Finally, there is the question of whether to dismiss with prejudice or without prejudice and allow Plaintiffs leave to amend. The Court has significant doubts as to whether Plaintiffs can plausibly plead any "direct physical loss" such that their case could survive a motion to dismiss, given the unequivocal language from *Sandy Point*. However, Plaintiffs are still on their first complaint, and it is this Court's practice as a general matter when resolving a motion to dismiss under Rule 12(b)(6) to allow at least one opportunity for leave to amend, particularly when, as here, a party has requested leave to file an amended complaint in response to a motion to dismiss. Therefore, the dismissal will be without prejudice, and if Plaintiffs believe they can cure the deficiencies raised in this Order through an amended pleading, they may file a motion seeking leave to file an amended complaint within 28 days of this Order. The motion must attach a redline of the complaint showing any changes and must be accompanied by a brief identifying how the proposed amendment would cure the identified deficiencies. If Plaintiffs do not file a motion seeking leave to amend by the deadline, this dismissal will automatically convert to a dismissal with prejudice.

## Conclusion

For all the foregoing reasons, Cincinnati's motion to dismiss (Dkt. 17) is granted and the complaint is dismissed without prejudice. Plaintiffs shall have 28 days from the date of this Order to file a motion for leave to file an amended complaint, if they believe they can remedy the deficiencies in their complaint outlined herein. If Plaintiffs do not file a motion seeking leave to amend by the deadline, the case will be dismissed with prejudice.

ENTERED:    3/28/23

_____
Nancy L. Maldonado
United States District Court Judge

9